The following constitutes
the order of the court. Signed June 24, 2016

*M. Elaine Hammond*

_____
**M. Elaine Hammond**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>Steven J. Yates,<br><br><br><br>Debtor.<br>_____<br>Starboard Commercial Brokerage, Inc.,<br><br>Plaintiff.<br><br>v.<br><br><br>Steve Yates, et al.,<br><br>Defendants. | Case No. 15-52585 MEH<br><br>Chapter 13<br><br><br><br><br><br><br>Adv. No. 15-5155<br><br><br><br><br><br><br>Date: May 11, 2016<br>Time: 9:00 a.m.<br>Ctrm: 3020 (San Jose) |

## MEMORANDUM DECISION

In 2008, Restaurant Investors Income Fund V ("RIIFV"), a California limited partnership affiliated with debtor Stephen Yates, entered into a Real Property Listing Agreement with Starboard TCN Worldwide (respectively, "Property Listing Agreement" and "Starboard") for the sale of his commercial property at 1200-1250 Bridgeway, Sausalito, California ("Bridgeway"). Subsequently, Yates entered into an agreement with Starboard for the sale of his restaurant business located on the property. Starboard obtained an offer to

purchase the business. As part of the deal, the purchaser required an option to purchase the Bridgeway real property. At the time the business sale was negotiated and documented the Property Listing Agreement had expired. The purchaser exercised the option. Bridgeway was sold without notice to Starboard of the closing, or of the opportunity to submit a demand into escrow for a commission.

RIIFV and Tropic Island Funds are named as defendants in this adversary proceeding but there is no evidence that the corporate entities received service of a summons. These entities are affiliated with Yates but did not separately participate in the trial.

Starboard contends it is owed a commission on the sale of Bridgeway, that Yates is personally liable for the commission, and the commission is nondischargeable or payable from recovery of a fraudulent transfer. The questions presented for trial are whether a commission is owed to Starboard; and if so, whether Starboard's commission claim is an obligation of Yates in addition to RIIFV, whether it may be discharged, or whether the estate may be enhanced by the recovery of an allegedly fraudulent transfer. For the reasons provided below, the court finds that Starboard has not established it is entitled to payment of a commission for the sale of Bridgeway. Accordingly, the remaining issues need not be addressed.

This court has jurisdiction over the objection to claim and adversary proceeding pursuant to 28 U.S.C. § 1334 and General Order No. 24 of the United States District Court for the Northern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (H), and (I).

Background:

The facts are largely undisputed. On July 24, 2008, RIIFV and Starboard entered into the Property Listing Agreement for Starboard to serve as broker in RIIFV's attempt to sell Bridgeway. At that time, RIIFV was the owner of Bridgeway. Yates is the shareholder, president, and CEO of Tropic Isle Foods, Inc. ("Tropic Isle"). Tropic Isle was the general partner of RIIFV. The Property Listing Agreement originally expired on July 9, 2009, but was extended through July 9, 2010.

Two weeks after entering into the Property Listing Agreement, RIIFV entered into a "Business Listing Agreement" for Starboard to serve as RIIFV's broker for the sale of the restaurant business located at Bridgeway. The initial Business Listing Agreement was extended through October 23, 2009. A new "Business Listing Agreement" was entered into between the parties in May 2010, providing for the exclusive right to sell the business through November 2010.

The property was actively marketed as a sale of real property, the business, or both beginning in July 2008. A viable offer was not received until two years later, in November 2010. That offer provided for purchase of the restaurant business, with a two year option to purchase the Bridgeway real property. Yates, on behalf of RIIFV, accepted the offer. At this time, the second Business Listing Agreement remained active but the Property Listing Agreement had expired four months earlier.

The Real Estate Option Purchase Agreement ("Option Agreement") executed in connection with the sale of the business includes a provision identifying Starboard as broker and providing that payment of a broker fee is the sole responsibility of seller. The parties dispute the purpose and intent of this paragraph.

The sale of the business closed in May 2011. Starboard received its commission due pursuant to the Business Listing Agreement at closing. Contemporaneous with the sale of the business, Yates requested and obtained a reduction of the future commission associated with Bridgeway. Starboard's agreement was set forth in a Commission Agreement dated May 26, 2011, although this document was never executed by Yates. The court finds that Yates' request for a reduction in the Bridgeway commission evidences that in May 2011, Yates anticipated a commission would be due for the real property sale if Purchaser exercised its option. However, when the Purchaser exercised its right to purchase, Starboard was not notified of the sale or provided an opportunity to make a demand into escrow for a commission related to the sale of Bridgeway. Yates did not testify as to what caused his change in position.

Analysis:

The issues before the court are whether Yates' contention that no commission is due is correct; and if not, whether Starboard's commission claim is an obligation of Yates' corporate entities, may be exempt from discharge, or subject to payment from the recovery of a fraudulent transfer to pay his wife's separate corporate obligation from the Bridgeway sale proceeds.

*Is Starboard owed a commission for the sale of Bridgeway?*

a) No commission due pursuant to the Property Listing Agreement.

The original term of the Property Listing Agreement extended from July 10, 2008 through July 9, 2009. Prior to the expiration of the term, the parties entered into an extension agreement that extended the exclusive listing period through July 9, 2010. All other terms of the Property Listing Agreement remained in effect. Sections 7.2 and 7.3 of the Property Listing Agreement provide that if the seller enters into a contract within 180 days of the expiration of the term with an entity previously identified by the agent as a "Registered Person," then the commission remains due. In order for this provision to apply, within five business days of the expiration of the term, the agent is required to identify in writing whom the agent negotiated with and the type of transaction contemplated. Here, the purchaser was not identified until approximately four months after the exclusive term ended and was not identified in writing as a registered person. So the contractual extension does not apply.

b) No extension or waiver of the Property Listing Agreement term.

California Civil Code § 1624(a)(4) provides that an agreement to employ a broker to sell real estate, or to find a purchaser of real estate, for compensation or a commission is invalid, unless there is a written contract signed by the party charged. On this basis California courts have long held that recovery of a real estate commission under an oral agency contract or in *quantum meruit* is not permitted. *See Kraemer v. Smith*, 179 Cal.App.2d 52, 55 (Cal. Ct. App. 1960) (citing cases). "A real estate broker as a professional man, is presumed to know that

Case: 15-05155    Doc# 35    Filed: 06/24/16    Entered: 06/24/16 16:35:32    Page 4 of 10

contracts for real estate commissions are unenforceable unless in writing. He assumes the risk of relying on oral promises and has no reason to complain if his efforts are unrewarded." *Id.*

But if a commission becomes due after expiration of the term of a broker's agreement, then upon sufficient factual showing, courts have held that the term limit is considered to have been waived, entitling the broker to payment of a commission. *See id.*; *Baker v. Curtis*, 105 Cal. App. 2d 663, 669-70 (Cal. Ct. App. 1951). Three factors are reviewed in determining whether a waiver or extension of the term occurred:

- After the term expired, did the property owner urge and encourage the broker to continue its efforts to sell the property?
- Did the broker continue to act as an agent with the knowledge, approval, and encouragement of the property owner?
- As a result of the broker's efforts, was a purchaser produced and a sale closed?

*See Kraemer*, 179 Cal. App. 2d at 55 (quoting *Baker*, 105 Cal. App. 2d at 669-70). Whether a waiver or extension of time occurred is a question of fact. *See id.* at 56.

Reviewing the first factor, the court finds no evidence that Yates, on behalf of RIIFV, encouraged Starboard's marketing of Bridgeway after termination of the Property Listing Agreement on July 9, 2010. No evidence was introduced of any contact between Yates and agents associated with Starboard regarding Bridgeway during this period. Susan Jordan, the agent most involved with marketing Bridgeway, testified that she actively marketed the property for approximately one and half years, beginning in the summer of 2008. During this period she met with Yates twice and spoke with him approximately five times over the course of her representation. Ms. Jordan's testimony is consistent with the term of the Property Listing Agreement and there was no evidence that she spoke with Yates after July 9, 2010. During this period she did provide a new colleague, Michael Matthews, with a lead to contact Yates about his interest in selling only the business. Mr. Matthews did so, and as of May 10, 2010, Yates, on behalf of RIIFV, entered into a new Business Listing Agreement with Starboard for the sale of the business. Mr. Matthews testified that he spoke with Yates in May 2010 regarding the Business Listing Agreement. He also had several conversations with Yates before presenting

a purchase offer for the business. But as confirmed by his testimony, Mr. Matthews only sought to sell the business. Thus, there is no evidence that after the Property Listing Agreement terminated Yates urged and encouraged Starboard to continue marketing Bridgeway.

Turning to the second factor, there is similarly no evidence that Starboard marketed Bridgeway during the period from July to November 2010. Mr. Matthews stated that he did not think of the real property until the Purchaser requested a purchase option. No evidence was introduced of, and Ms. Jordan did not testify to, any specific marketing or discussions with interested parties during this period.

Notably, the cases finding a waiver or extension of the term of a broker's agreement look to specific, affirmative acts by the property owner and broker. For example, in *Kraemer*, the owner refused to sign a new exclusive listing but told the broker she could work on the property. The broker continued to meet with potential buyers. After meeting with one individual, the broker shared the purchaser's interest in the property subject to one condition. The owner responded "bring me an offer without any conditions and we'll accept it." Afterwards, the owners told the broker on three to four occasions to find them a buyer. Approximately six months after the purchaser's initial interest, the condition was cleared and the broker contacted the purchaser about proceeding with the sale. *See Kraemer*, 179 Cal. App. 2d at 54.

The continuous, active work of a broker following termination of a contract that was rewarded in *Kraemer* is not found here. Starboard performed extensive work and actively marketed Bridgeway while under contract. But there is no evidence of this occurring after the Property Listing Agreement expired. For that reason there are no facts to establish that a waiver or extension of the term should be applied. Instead, the real estate purchase option materialized as a side effect of the work performed in marketing the business pursuant to a separate Business Listing Agreement.

c) No alternate agreement for the payment of a Bridgeway commission.

In the alternative, Starboard asserts that the statutory requirement for a broker's commission of a written agreement signed by the party to be bound may be satisfied by alternate documents. Starboard points to the Business Listing Agreement, the Business Purchase Agreement ("Purchase Agreement"), and Option Agreement as evidence of the contract. Each of these documents is in writing and signed by Yates on behalf of RIIFV. The issue is whether these agreements, either separately or together, commit to payment of a real estate commission.

*Business Listing Agreement:* RIIFV retained Starboard as its broker to market and sell the restaurant business as a going concern by this agreement. It provides that the sale of the business is not contingent upon a sale of the real property on which the business operates. Further, notice is provided in two locations—including immediately under the title of the document—that a separate listing agreement is required for any real property to be included in a sale. As such, this document does not support an agreement to retain or compensate Starboard as a broker for the sale of real property. In fact, it does the opposite by requiring an additional agreement.

*Purchase Agreement:* Yates signed and accepted the terms of the Purchase Agreement, which included a two year option to purchase Bridgeway. This additional provision includes the assumed debt and purchase price should the option be exercised. However, it does not make any reference to a commission for the sale of real property. The Purchase Agreement confirms that Starboard was the joint broker for buyer and seller on the business sale. It also includes language that the seller "agrees to pay compensation to Broker as specified in a separate written agreement between Broker and [Seller]." ¶ 39.A. This language recognizes that a commission may be due in connection with the sale, and provides for it to be determined by a separate agreement.

One term in the Purchase Agreement leans in Starboard's favor. Throughout, the terms "Broker" and "Real Estate Broker" are used interchangeably and without definition. The additional block on the last page references Starboard as a "Real Estate Broker." This section follows the buyer and seller signatures, and provides for brokers to share commissions as listed

7

on the MLS or reached by separate agreement. Notably, it lists Starboard as both the selling and listing firm. This is consistent with Starboard's representation in the business sale but not the Bridgeway sale. Viewing the agreement as a whole, the court finds that the term "Real Estate Broker" is used at times in place of the generic term "Broker" to refer to the entity responsible for negotiating the sale of the business. This is consistent with standard practice and form agreements that incorporate sale terms in an agreement between the buyer and seller and payment terms in an independent agreement between the seller and broker. As a result, the court does not find the Purchase Agreement indicates an intent or obligation to provide a commission to Starboard on the sale of a different asset.

*Real Estate Option Purchase Agreement:* The Option Agreement was addressed extensively at trial. Section 6.1.14 provides that seller has not retained any broker or other person entitled to a broker's fee or other commission based upon the transaction contemplated by the agreement, "except for payment of a broker fee to Starboard . . . the fees and expenses of which shall be paid solely by Seller." In its initial draft the Option Agreement did not identify the broker. Scott Phillips, the attorney for Yates and various entities he controlled, provided Starboard's name in an email with comments on the proposed draft. The email states that these are his client's comments to the agreement. Starboard construes this provision and Phillips' email, as an agreement to pay it a commission. On the other hand both Phillips and Doron Baruth, Starboard's representative at trial, testified that this is a standard contract provision used to identify brokers and prohibit an unknown party from appearing and requesting a commission. As such, the court finds it is not a promise to pay a commission so much as a means of eliminating other contenders. Thus, it too is insufficient to establish a commitment to pay a real estate commission.

*Review of further claims:*

Having determined that Starboard does not have a valid claim for recovery of a commission from the Bridgeway sale, the court need not determine whether Yates may be personally liable for an obligation of RIIFV. Further, Starboard's remaining claims of a

fraudulent transfer of assets in the sale closing or based upon fraud are premised on Starboard having a right to receive funds. Hence no further analysis of the issues raised at trial is appropriate.

Conclusion:

As Starboard did not establish a right to receive a commission from the sale of the Bridgeway property pursuant to California law, the court grants Yates' objection to claim and finds for Defendant Yates in this adversary proceeding. An order and judgment consistent with this memorandum decision will be issued concurrently.

\*\*END OF MEMORANDUM DECISION \*\*

**COURT SERVICE LIST**

**Via ECF:**

All Recipients